Next case on this afternoon's docket is the case of Larry and Frances Dobbs, Wayne Richard and Lorena Richard v. Donald Wiggins. And we have Mr. Terry Sharp for the appellant. And we have Doug Hoffman for the appellate. You may begin, Mr. Sharp. And you're the man with the recording. I tried to get a recording in honor of the administrative difficulties that are so overwhelming that I do not have it here today. I couldn't get it in a quarter of time to prepare for it, so I'm not going to use it. Thank you. You may please record. My name is Terry Sharp and I appear for Don Wiggins, the appellant herein. In 1995, Don Wiggins made a considerable investment in land, about 40 acres, a nice home and dog kennels at the end of a dead-end road about 8 miles south of here. He moved in with 50 bird dogs. His kennel grew to about 70 dogs at one time. And during the next 10 years, he developed a national champion bird dog. He testified that he turned down $200,000 in cash for that dog. And he produced evidence where he sold the offspring of that dog and other dogs in his kennel for $5,000 and up to $25,000 and regularly sold pups for $2,000. He lived next to his neighbor for 10 years without complaint. He went by their house, he waved at them, he talked to them once or twice a month, asked them if the dogs were any problem. Never any complaints until August of 2007. A complaint was lodged and immediately that day, Don Wiggins took some corrective action. He took six or seven of his dogs that were the worst barkers, loaded them up and they never came back. In spite of that, a few weeks later, this lawsuit was filed. And this has resulted in a horror story that brings me before this court today. In this appeal, we raise three points. And respectfully, we believe the trial court was wrong on all three of them. As in all cases, of course, this is a question of law and fact. But my opponent and I largely agree on what the law is. We all cite some other cases, but it all comes back to this court's Wood decision of several decades ago. So this basically turns to be an argument about the facts, and I'll be concentrated on the facts. I believe it's the application of those facts that made the error. The first problem we have with this case, we filed a motion in limine. This case is all about how loud is loud. How much noise is too much? How often can a dog bark before it becomes obnoxious? These are critical facts that could have been scientifically measured. A recording device could have been put in a controlled environment on the dog's yard and let it play for 24 hours. A day in the life type thing. A week. This could have been done. Instead, the court entered, over my objection, evidence that was made from a little recording device, not unlike what I use in my office. There was no independent verification. Where the recordings were made, how loud the volume was turned up when they were made, at what time it was recorded, or how it was done. Over my objection, these were admitted into evidence. I believe that's prejudicial and improper. Less than five minutes of these tapes were played. I wanted to play one minute for the court because it's the one that helps me the most. But less than five minutes were played. In discovery, I was given almost 20 hours of tapes that were made on these two handheld devices. And obviously, the plaintiff went through and simply cherry-picked what helped them the most and played them. And that, I think, was prejudicial. After considering and hearing all this, at the loudest, the dogs made no more noise than a passing train. And I'm sure your honors are familiar with what a passing train can sound like here. We had two go by this morning. But in this case, the trains are a mile and a half or a little more away along Route 37. You could hear on one of these tapes the trains were clearly audible inside the dog's house. And the Richardsons, the co-plaintiffs, admitted that the trains were as loud as the dogs barking and that the dog barking had increased with the increased train traffic the last several years. Judge Welch, in the Timmerman decision of last year, said, quote, A trial court's decision to admit evidence will not be reversed absent an abuse of discretion. I respectfully suggest that this was an abuse of discretion to allow the plaintiff to cherry-pick five minutes out of almost 20 hours and base their evidence upon that. Next point. This case is part of the law of nuisance. And to have a nuisance, as we've both discussed at length in our brief, it must be substantial. It must be negligent or intentional and unreasonable. And here, there's no evidence of negligence, so we're in the intentional thing. The plaintiff produced witnesses. All four of the plaintiffs testified. Mrs. Dobbs' good friend, Mary McCowan, who lives two miles or so down the road, testified. Their friend, Red Downey, who lives down the road, testified. Randy Phillips, a contractor with whom they'd spent some $25,000 to $35,000, testified. He also testified on cross-examination that he just didn't approve of people who kept dogs pinned up. I believe he was a little prejudiced, to say it mildly. Now, that was their witnesses. Now, where was the unbiased witness? Well, as it so happens, in this period between the first complaint in August and the time this lawsuit was filed, in that period of time, the plaintiff called out the state kennel inspector. And he came out and found a technical violation of the kennel. There was no dispute. It was promptly taken care of. But guess what? They didn't call him. I presume it was because he was unbiased and wouldn't have said what they wanted to hear. But they didn't call him. Why didn't you call him? Why didn't I call him? I never even talked to him. That's not correct. I did talk to him. I didn't get anything other than what I just had suggested. He thought it was all right. And I thought, since they had the burden of proof, something I'll talk about in a moment, I hope, it was up to them to prove it. And I had other witnesses, which I'm getting ready to discuss. We called the Jefferson County Animal Board. He was here, close by. He had also been sent out, presumably, by the plaintiff. And he came out and stood adjacent to the plaintiff's property with the defendant and talked, the testimony was, for 30 minutes, the same 250 yards away. His testimony was, he could hear some barking, but nothing loud enough to disturb anyone. This man, we'll call him the dog professional, if you will. We also called the mail carrier. The mail carrier testified that five days a week, except if he's on vacation or sick, he goes down to the end of the road, which is the beginning of the defendant's property and the dog's property, turns around, puts mail in the mailbox. He does this with one window down all the time and with two windows down in the summer. His testimony was, he did not recall ever hearing a noise of the dog. He did say he had the radio on sometimes. So you're saying that a lot of these witnesses said the dogs didn't bark? The ones that we called were not connected with the case. What did you mean then when you said that he took away six or seven of the worst barkers? At the time, he was first told. First told that there was a problem. He was actually loading up a trailer load of dogs to go up in North Dakota, I believe it is, to train. It's hot and you can't train dogs in the summertime here. And they go up there, they have an earlier season. And instead of taking all the dogs he wanted, he simply took some of his worst barkers, put them on the trailer, took them to North Dakota, and disposed of them up there. Well, we all know dogs bark. I know. Thank you. I mean, I don't want to be obvious, but if the plaintiff had presented no witnesses and the judge heard their testimony and may or may not have heard the tape, would it have been within his discretion to have found against your client? That brings us, I think, to the Woods case, Your Honor, which is the law of this district in line with the law of the state of Illinois. I respectfully disagree. And I'd like to answer your question as I go forward if I may. But are you trying to distract us with your tie? This is part of my rebuttal. I am wearing an English Pointer dog case. I've had it for a number of years, so I put it intensely. I hope you would notice. Thank you. Well, this case is about much more than barking dogs, respectfully. This case is about animal nuisance law. And I'll jump forward into my rebuttal. But we're talking about a lot of dogs. And this is also hog facilities and dairy facilities because the same law applies. Go ahead. We called Gordon Ryan, a noted animal veterinarian in southern Illinois. He had never met Don Wiggins before. He came, found the camels were in good shape, did not notice any unnecessary noise. He testified that he himself, a noted professional in southern Illinois, keeps a number of bird dogs 150 yards from his neighbor's house, closer than the plaintiff's house here. I would also note that all of this town is within one and a half miles of a railroad track. Somewhat within two blocks, but a mile and a half is a long distance. And yet the train is as loud as the dogs. Let's turn to the Woods case now, if you may. The Woods case involved 50,000 chickens. 31 fans blowing air through the hen house and over the manure pit to do various things with animal husbandry. It created, the court found, an odor that caused plaintiffs to have to seal up their house. It caused an odor that caused people to be nauseous. It caused a situation where, Judge Jones says, large, greasy flies in his opinion. It's obviously a bad situation. But more importantly, your honors, in Woods, the facility was 25 feet. The bench on which you sit is approximately 25 feet. 25 feet from someone's house. How much is a month? Is it too much? I don't know. But I think that was clearly it. I'm not arguing that. But the Woods case sets a level. The question is, how do we apply this fact? And frankly, to go back and answer your question about barking dogs, whether it's one dog or 20 dogs, I think it has more to do with the frequency with which they bark than the fact that 20 dogs make that much more noise than one dog. But using your analogy, aren't 100 dogs, I'm just taking that figure, more likely to result in more of a continuous barking situation? I think statistically that's an accurate statement. Okay. It has to be. It just has to be. Show me the money is a phrase that's crept into our lexicon. Show me the facts that make this case even remotely like the Woods decision. It's not. 25 feet, 50,000 chickens, 31 fans, it's not there. Particularly when the impartial people, including an animal warden, didn't think there was a problem. Oh, one other thing. The court specifically found that the plaintiffs were not entitled to monetary damages. Now, let's go to the injunction part of it. Woods, the court found an injunction. 25 feet is too close for a chicken house. But it was entered under, quote, carefully controlled circumstances and allowed the defendant an opportunity to cure. Here, at the date of the first complaint, Don started taking steps to correct the problem. There was a lot of testimony by Don, and a significant portion was the steps that he had taken during the period between the time he was sued and the day of trial. This was a two-day trial. He even testified that he sat on his porch for two hours and heard virtually no dogs barking the night between the two trials. And the plaintiff didn't refute that. The dogs didn't bark the first night of trial. Maybe he threw a switch or something. They didn't. I'm being facetious. But he had done a lot to control the problem, just as the court direction would. As I pointed out in my opening comments, this is a useful endeavor. I mean, we don't think of raising hunting dogs as being very exotic. But it is. There's lots of money involved in this. There's a lot of dog kennels in southern Illinois, in the southern district. And he has spent several, he has a considerable investment here in a house and kennels. And to just be put out of business without following the guidelines of Woods, I think, is improper. Do you know how the judge arrived at the six dogs? I have no idea, but I know this. Number six was in the case, and in one place that I'm aware of, that happened to be the number of dogs that Dr. Ryan kept for his own personal use. Apparently, he decided that since a noted bird dog person who used them for his own use could keep six dogs for his personal use, that that was all that could be used. But Judge Stanley didn't point that out in his opinion either, and I'm just speculating. In the Woods decision, the court held nothing in this order should prohibit the defendants from taking steps necessary to change the nature of the operation, reduce the odors, et cetera. But unlike Woods, he was engaged in useful business, just like in Woods, but he was given no opportunity to reduce the number of dogs, or institute additional corrective measures. They simply put him out of business. If I haven't pointed out this, he has a national championship dog. He takes one female, he breeds the dogs, and gets the expected five to 12 pups. He is now in violation of court order, which, because of the way it's written, is in the form of a permanent juncture against him ever doing anything on this property. I submit that under Woods, it's overbroad. I submit that under the nuisance law, it wasn't properly established, and more importantly, the emotional limits should have been granted. Now, if we want to find some middle ground, I don't like middle ground because I think I'm right, but if you said you can keep 50 mature dogs and breed them as he did for 10 years before there was an objection, and as everybody admitted after there was objection, he took steps and reduced them, that would be something interesting. And it's particularly interesting because in their original complaint, the plaintiff asked for two things. The first, that the defendant be enjoined from killing dogs on his premises. That's what they got. But in the alternative, they asked, quote, that the defendant be ordered to decrease the number of dogs in his possession to a number deemed reasonable by the court, three dogs, and to take steps necessary to adequately suppress the noise caused by any barking. Respectfully, the judge was given two options, and contrary to the teachings of this court in Woods, he took the more draconian one. One last point. I didn't know who was going to be on the panel. As Judge Stewart wrote in a recent decision, SBS v. Herman, arbitrary and reasonable and not based upon the evidence. I respectfully suggest that that's what I'm dealing with here. I'd be glad to answer any court's questions. Thank you. Thank you, Mr. Sharfield. The opportunity to rebut. Mr. Hoffman, your argument? May it please the court, Mr. Sharf. Good afternoon, Your Honors. My name is Doug Hoffman, and I do represent the plaintiffs, Larry and Francis Dobbs, and Wayne and Lori Richard in the matter before the court today. Your Honors, we are here, and we filed this lawsuit initially in Jefferson County Circuit Court because my clients have the right to be able to do the things on their property that the rest of us take for granted. They want to be able to sit out on their back porch and drink a cup of coffee or have some folks over for entertainment. They want to do yard work and gardening. They want to be able to leave their windows open during pleasant nights. And they can do all of that now, but the difference between us and my clients is that they have to do it with constant barking of dogs in the background. And as testimony, which I'll get into here after a while, suggests, a lot of those things they can no longer do because of that. And as Larry Dobbs, one of the plaintiffs, testified at trial, he only does yard work now because it has to get done. The yard has to get mowed. The flowers need to be tended to. But he used to enjoy doing that, and now he feels stuck using his words. Your Honors, during a two-day bench trial, Judge Stanley, the trial judge in this matter, was presented with extensive testimony and evidence showing that the defendant's dogs are a nuisance that should be abated. The trial judge was in the best position to observe the numerous witnesses. Mr. Sharp raised the issue of bias on the part of some of our witnesses, and that's fine. He can allege that. But Judge Stanley was in the position, as the trier of fact, to make those conclusions and to look at those alleged biases that Mr. Sharp mentioned on cross-examination of those witnesses. But he still found in our favor and found that our witnesses provided us with the evidence, the testimony, to live up to our burden of proof to have a ruling in our favor. We believe the judge was correct in his ruling on all counts. Is there a date that your clients isolate as to when the problem began? He makes reference to 10 years there wasn't a problem, 2007 it began. Is that your position? Is it since 2007 it's been unbearable? No, Your Honor. I would have to respectfully disagree with the opposing counsel, and it's simply in the record that Mr. Dobbs, for instance, testified that the dogs were barking from day one. So it's been a problem since day one, since the day he moved in? At least the dogs have been barking from day one. But what gets us, and everyone did testify, that they increased over time, and eventually, you know, I think I would probably do the same thing, you try to put up with it. And after a while, they've reached a breaking point where they can no longer put up with it. And what's important here to point out, which is something I'll have to disagree with Mr. Sharpe on, is the first complaint to Mr. Wiggins from Larry Dobbs or any of the other plaintiffs didn't come in 2007, in August, just a couple of months before we filed the suit. It was stated by Larry Dobbs at trial and not rebutted by the defendant when he testified that several years prior, we don't have an exact date, but in Mr. Dobbs' words, several years prior, he planted cedar trees along the property line. And these cedar trees are now about 12 feet tall, according to his testimony. Well, let's say that's 2004. Sure. He still would have lived there for nine years before he planted the trees. That's true, Your Honor. And I would simply state, and as my client stated in their testimony, that they tried to put up with it. And after a while, they just decided they couldn't do that anymore. But all of them did testify, and Francis Dobbs, in addition to Larry Dobbs, testified that the barking was a problem from day one, that the barking started right away. And as the evidence has shown in the case, it was around 2007, I think the defendant admitted himself, that he had approximately 100 dogs. But that the number had fluctuated over the prior years, and even to today. But what's important here, as far as the nuisance aspect, and why the judge's ruling was not against the manifest weight of the evidence, which is our standard in this matter, on this appeal, is that we didn't only have testimony from the four plaintiffs. We had testimony from two neighbors who also live nearby. Mary McCowan lives two miles north of the dogs, and she testified she can hear them at her house. When she's outside, she cannot hear them inside her house, although our clients testify that when the Dobbs and the Richards are inside their homes, they can hear the dogs, but they are quite a ways closer. For example, the Dobbs are 250 yards away, give or take, from the dogs. The Richards are about a quarter mile. It was established at trial. But Ms. McCowan testified that she can hear them at her house, and she's also had occasion to be at the Dobbs' house and testified about one specific instance in the past when she was having a conversation with Francis Dobbs right outside the Dobbs' home on the Dobbs' property, and they had to take the conversation inside because the barking was too loud. They couldn't concentrate on what they were talking about. And Red Downey, who I might add, is another neighbor about a mile north of the dogs, and I would add in terms of Mr. Sharp's allegation of bias that Red Downey used to work for Mr. Wiggins. I don't believe there was anything in his testimony to suggest there was a falling out, but he used to have a relationship with Mr. Wiggins and may still have a relationship with him, but he's also friends with the Dobbs. But he testified he can hear them when he's out in his yard as well, and he also testified that when he is present that has been present at the Dobbs' home or at the Wiggins' home, that he can hear the dogs barking there. And I asked him at trial in his testimony on direct whether he found when he was at the Dobbs' property or the Wiggins' property, whether he found the barking to be annoying. And his response was interesting. He said, no, it wasn't annoying, and I was a little surprised by that and said, well, why not, sir? And he said, because I know I can get in my car and go back to my house where I can go inside and not hear them. My clients don't have that luxury. They have to hear it all hours of the day and night, and it was established at trial that they can hear them at night. And, for example, Wayne Richard testified that one time when he was on call for work as a lineman at Tri-County, he was called in in the middle of the night and heard the dogs playing his day when he came out at 2 a.m. to go to work. So getting back to one of the statements I made previously, Mr. Wiggins was on notice that his dogs were a problem, and that was not disputed by him when he had a chance to present his case. That goes to the intent element of the nuisance action, which it's important to point out in the case law, intent is not simply that Mr. Wiggins put his dogs out there to bark and cause a nuisance. It's more a question of foreseeability, which is pointed out in the Bloomingdale case, which we cite, and also the Woods case. It's that the offending landowner, Mr. Wiggins, has to know, or should reasonably have known, that his dogs were creating a nuisance. And here, Justice Chapman, as you pointed out during Mr. Sharpe's argument, dogs bark, and especially when you talk about the number of dogs here, we believe it's reasonably foreseeable. When you have 100 dogs together, they're going to bark. So where does he take his bird dog business then? Your Honor, we believe the only, and for one aspect of that, I don't know if Mr. Wiggins owns any other land anywhere else he could take them to, but the point here is that he has taken steps to try to abate the nuisance. He bought ultrasonic kennel silencers that emit some inaudible sound to humans that the dogs would keep them from barking. He put shock towers on some of the dogs. He's got a water sprinkler system. And my clients all testified that the dogs were still barking up to the day of the trial, even after he had tried to do this. Well, my point is, I mean, by everybody's testimony, this is out in the country. This is not in town. Very rural area. I mean, does he have to buy two square miles of real estate to have dog business? Not necessarily, Your Honor. I think he needs to shrink his dog business to where it's not a nuisance on his neighbors. Either he live out in the middle of nowhere where he can have as many dogs as he wants and nobody is going to be concerned about them. But as the facts are in this case, he's got people 250 yards and a quarter mile away. So we believe the only thing he can do. And the testimony was somebody else could hear him two miles away. That's where I got the two square miles. Yes, Your Honor. And actually, Frances Dobbs testified she goes for walks on almost a daily basis and walks about three miles away and could still hear them three miles away as well. So to add to that. But one point I'd like to make is Mr. Wiggins stated himself, after hearing evidence that all the steps he tried to take since he was put on notice to get his dogs quieted down, he pulled out some of the problem dogs, he put in these pieces of equipment I mentioned earlier. But my clients have still said the dogs are still barking and it's still on a level that's annoying. And Mr. Wiggins said, and I'm paraphrasing a trial when he testified at trial, I don't know what else to do. And I think that is a pretty important statement because in our position, what's left to do is to shrink the number of dogs, to get rid of the dogs. Now, Mr. Hoffman, your brief makes it appear that it's more of an advocation than any kind of income-producing concern. How does that figure in? I think it figures in, Your Honor, as far as the elements of the nuisance case under the unreasonableness element. And as the Woods case tells us, which we cite in our brief, the court is to do a balancing test. Basically, the gravity of the harm against the plaintiffs versus the utility of the defendant's business and its location. And we believe that Mr. Wiggins reducing the size of his operation with his bird dogs is not going to put him in the poorhouse. Will the records show that he actually had net profits from these dogs? There was evidence introduced at trial, Your Honor, by an exhibit Mr. Sharpe had introduced that showed for recent years, it may have been 2004 to 2008, if I'm not mistaken. I could be off a year. But he lists his income from there, and there were some substantial numbers on there. But on cross-examination, I asked him, now I'm looking at these figures here, sir, and, you know, for example, in 2008, and I can't remember the number, but you had X number of dollars as your income. Does that take into account your expenses for your operation? He said no, and then he told me what it was. He ended up losing, I think, about $15,000 that year. And in the previous years, it was not much different, I don't believe. So basically he's testified during his case in chief that he and his wife own a trucking company. They ride together in the truck, leave for periods of time, and that he makes over $200,000, approximately $200,000 a year from that. So we do characterize it as simply a side project, if you will. And it's one, I mean, admittedly, he's done it since he was a kid, raised and trained bird dogs. And the issue here is when you balance the gravity of the harm and hearing the abundance of testimony on our side versus what that business is for Mr. Wiggins and also the problems that it's causing for my clients, then we think the balance weighs in our favor and the judge was correct. You said a couple of times, in essence, that his dog business just got too big and what needs to happen is it needs to be reduced. That's correct. Did you suggest a reduction to the trial court? We suggested a number that the trial court felt was reasonable, I believe, Your Honor. Did you suggest the six dogs? We did not, Your Honor. We did not suggest a number. What did you suggest to the trial court? Pardon me? Did you suggest a number of dogs? No, we didn't. Okay. We just let the evidence speak for itself. And Mr. Sharp is correct that Dr. Ryan, a veterinarian who has experience with bird dogs and has raised some of his own, the most he ever had in his kennel was six. And so that is possible, that's where Judge Stanley got the number. But it's our position that Judge Stanley had extensive evidence and testimony at his disposal to make that ruling, and we believe it was reasonable. The case law we cite in our brief, as far as the injunctive relief and the six dog restriction, is that the trial court has broad discretionary powers and the standard of review is whether there's a manifest abuse of that discretion. We think once Your Honor will see the record and see the evidence that was presented that Judge Stanley made the right call. Was there any evidence presented by anyone to the effect of what is a reasonable number of dogs to have in that type of neighborhood? There was not, Your Honor. No specific numbers were suggested other than Dr. Ryan mentioning what he had. So there really wasn't any evidence about what an appropriate reduction down would be? As far as a specific number, no, Your Honor. But I think a lot of numbers as far as what Mr. Wiggins had with his dogs over the years was presented, and you couple that with the testimony I discussed early on in my argument here about them barking from day one, we think Judge Stanley was correct. I guess the least number Mr. Wiggins ever had was 50 or 60, is that right? I believe he testified, and I may be wrong here, I'd have to consult the record, Your Honor, but just to give an educated guess, I believe when he brought his dogs to the property he started with 50. It seems like a drastic reduction from the lowest number before was 50 down to 6. And we recognize that, Your Honor. It is a drastic reduction, but we think the evidence is there that we presented that shows the torment that these dogs have caused my clients for years, and the fact that they basically had no other alternative but to bring the case and try to put a stop to it because the whole essence of nuisance law is that you get to use your property the way you want, I get to use my property the way I want, but if you use yours the way that overflows onto mine, then we've got a problem, and that's exactly the case here. I'd like to touch on the audio recordings, if I could, that Mr. Sharp mentioned. Audio recordings were admitted into evidence. They were played at trial over Mr. Sharp's objection. We believe there was a proper foundation laid for those recordings. We cite numerous places in the record in our brief where a foundation was laid for these recordings. The recordings specifically were played during direct examination of Larry Dobbs and Francis Dobbs as they made the recordings themselves, and you will see when you review the record, we established foundation by their testimony that what they heard on those recordings fairly and accurately represented what they heard at the property at that time. Also, Larry Dobbs testified in great detail as to where he took these recordings, how he operated the recorder, how he put the date and time stamp into this digital recorder, and also chain of custody. As soon as the recordings were finished, they were delivered to me as their attorney, and subsequently in discovery, they were disclosed to Mr. Sharp. Was Mr. Sharp's statement a fair statement that you took 20 hours of recordings and cherry-picked your best five minutes to play to the court? It's advocacy. I'm not saying there's anything wrong with that. Is that a fair statement, though? It's a fair statement, Your Honor. Okay. Okay. Yeah, we, I mean, obviously I wasn't going to stand up and play five minutes of silence. Of course. That wouldn't have been doing a good job for my clients. But, Your Honor, the point is, going back to what I just said, Mr. Sharp had the same 20 hours to take, and he could have stood up on cross-examination or wherever and played a recording that had five minutes of silence. I'm not saying there is one, but he could have done it, and that's the whole point. They were at his disposal, they were at our disposal to use, and most importantly, we established proper foundation for them in the testimony. And I would also add, and this is taking kind of an alternative view of this, if the court finds that it was erroneous that these tapes were, or these recordings, pardon me, were introduced into evidence, we believe it was harmless error. Because if you look at the record, the extent of evidence, other evidence, besides these few snippets of audio recordings, there was ample evidence there for Judge Stanley to find that a nuisance existed, that it needed to be abated, and that an injunctive relief was the appropriate relief in the case. The judge, one of the issues raised by Mr. Sharpe in his brief, and I don't recall if he mentioned it here today, is that volume manipulation. Basically, I could have stood in the trial court and hook him up to a speaker and turn it up to as far as it would go and make the dogs sound pretty loud if I wanted to, but I'm not saying that was done. And Mr. Sharpe also made the point that a microphone could have been plugged into the recorder and put another 300 feet away from where the tape recorder was sitting. However, those go to the weight of the evidence, is our point. They don't go to the admissibility of the evidence, and Judge Stanley himself pointed that out in response to Mr. Sharpe's concerns on the record. And I'd like to quote what he said, if I could, and it's on page 579. He says, I understand that there may be issues as to volume, things of that nature, and because of that, I think the court will place the appropriate amount of weight on that evidence. So the judge was basically saying, I understand those issues, and they do go to weight, and I'm going to consider that. But as I keep repeating here today, he had plenty of other evidence to look at that would support the ruling that he gave in this case. Your Honors, all my clients, the plaintiffs want is for the barking to stop. Frances Dobbs put it pretty well at trial when she said, we have a house, but we don't have a home. They want to enjoy their homes as normal people do, as you and I do. Noises happen out in the country too. You've got coyotes, you've got other wildlife and other noises. But as the evidence showed in this trial, in this case, these dogs go way beyond the normal sounds of rural life. So we're asking that you affirm, Judge Stanton, this judgment. Thank you. Thank you, Mr. Hoffman. Mr. Sharp, your rebuttal. In my opening brief, I promised, I quoted from a popular Sherlock Holmes thing and talked about the Silver Blaze book and the dog that didn't bark. And I promised you six dogs, and I want to talk about my dogs. We were directed by the trial board to submit written closing arguments. We submitted a written closing argument, and I'm going to quote you from parts of that closing argument. And I do that because there's some material parts of our case that we argued in closing argument. My opponents and ethical lawyers from a good law firm needed to rebut them in closing argument. You can't rebut them today, and that's why I think you have to reverse this case. Also, before I get into my dogs, I must make one point. Earlier I pointed out that the first night of trial, there was no barking or substantially no barking, and that was not rebutted. Mr. Hoffman is wrong about one other thing. There was also testimony that within the last few weeks before trial, Don had found out about a way to put muzzles on a dog and condition it to it,  Now for my dogs. First dog. This is from my closing argument. Four recordings of dogs were played. One contained recordings, noises of birds, crickets, and train. There was evidence that the train was one and a half miles away. The train whistle was as loud, if not louder, than the barking dogs 250 yards away. They didn't rebut that. The dog didn't bark. Number two. The dogs could not be heard inside the house. The recording started with Mr. Dobbs being outside and then going in the house to get his cell phone. At first you could hear the dogs in the background, then the sound of the dogs' door opening and closing, and then footsteps on the tile of the kitchen floor presumably, but no barking. These are, you're referring definitely to tracks that were played in evidence. These are. Yeah. Of the five minutes that were played, this is what the court heard during that. And I listened to my closing argument and they didn't rebut it. And while I'm on this point, plaintiffs testified that they could hear dogs inside the house. At least Mrs. Dobbs did. It's not clear whether they did, but these people said, how difficult it is to set a recorder inside your house and leave it on for a while and come in and play in the court. They didn't do it. There was no control of the recording. Third dog. Noise was worse in the year 2006. In 2007, the Dobbs spent $20,000 to $35,000 remodeling their house, added a new room facing Wiggins' property. The Dobbs never discussed with the contractor ways to reduce noise coming in from the outside of the house. If the nuisance was so substantial as to give rise to a cause of action, then surely it was substantial enough during a planned remodeling to inquire about or install noise-abating material. This was done in 2007, three years after the cedar trees, Your Honor, before they ever complained to the defendant. They would spend all this money remodeling their house. They don't deny it in their closing brief, or their reply brief, excuse me. Next dog. There was a 214 inspection of the property. Three lawyers, three of the plaintiffs, the defendant, were seven people standing. And I'll be the first to tell you, Your Honor, when we first got there, dogs were barking loud. The judge was there too, I presume. Pardon me, the judge was not there. The judge was not there. The judge was not there. Just the parties, okay? Dogs were barking loud. I later got three of the four plaintiffs to admit under oath that after we'd been there for a while, we stood out in front of the kennel in sight of the dogs, carried on a conversation, and a conversation just like I'm speaking now. And they admitted that. And as I said, the plaintiffs admitted at trial that all present were able to carry on a normal conversation without being disturbed by the dogs. They couldn't deny that. And as I went on to say in my closing argument, they didn't make a recording of it or have an expert present. How easy it would have been to have an accurate body of evidence for which the trial court could consider this hand-held thing. And by the way, I was talking about the hand-held. I was talking about the control thing. My dogs were running out of time. They had the burden of showing Wiggins was negligent, but they only alleged it was intentional, and the overwhelming evidence was he took affirmative steps to cure him. They didn't deny that. We talked about the Bloomingdale decision. In the incident matter, evidence was unrefuted that when Wiggins asked the plaintiffs over the years if the dogs were a problem, there was no compromise. In Bloomingdale, there was complaints for a year and a half, and nothing was done. Here, on the very day, there was a problem all the way. This is about moving dogs. This district sits in the St. Louis milk shed. There's dairy farms all over. There are huge hog farms. Can I have a moment? You can have just a moment to recap. This is another animal nuisance case. I'm told that you have a substantial hog nuisance case on your docket. We have to have a decision. We need guidance and a bench and bar from this court about how to apply the Woods decision and respectfully suggest that that guidance will include the points I've raised, and this case has to be reversed. Thank you for your indulgence. Thank you, Mr. Sharp. Thank you, Mr. Hoffman, for your briefs and arguments. We'll take the matter under advisement and under ruling of due course.